**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

VICTOR BRANNON,          )
                                  )
       **Plaintiff,**        )
                                  )     **No. 3:12-00827**
**v.**                         )     **Judge Nixon/Brown**
                                  )
**MICHAEL J. ASTRUE,**    )
**COMMISSIONER**          )
**OF SOCIAL SECURITY,**   )
                                  )
       **Defendant.**      )

**To: The Honorable John T. Nixon, Senior United States District Judge**

**REPORT AND RECOMMENDATION**

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 18) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI benefits on September 3, 2008 (Doc. 10, pp. 137-41), alleging a disability onset date of October 1, 2007 for DIB and August 2, 2001 for SSI (Doc. 10, pp. 137, 140). Plaintiff claimed that he was unable to work because of seizures resulting from a gunshot wound to the head in 1988, Hepatitis C, mental problems, a history of drug use, memory and concentration problems. (Doc. 10, pp. 56, 155) On September 3, 2008, plaintiff amended his SSI disability onset date to October 1, 2007. (Doc. 10, p. 136)

Plaintiff's claims were denied initially on December 9, 2008, and again upon reconsideration on March 5, 2009. (Doc. 10, pp. 52-56, 101-04) Thereafter, plaintiff filed a request on March 16, 2009 for a hearing before an Administrative Law Judge (ALJ). (Doc. 10, pp. 105-06) A hearing was held on July 20, 2010 before ALJ Donald E. Garrison. (Doc. 10, pp. 11-30) Prior to the hearing, plaintiff's non-attorney representative, Jim Friedlob, Ed.D., amended the disability onset date for both claims to September 16, 2008. (Doc. 10, pp. 13-14, 149)

The ALJ entered an unfavorable decision on November 12, 2010. (Doc. 10, pp. 58-89) Thereafter, plaintiff retained the services of attorney Michael Williamson through whom plaintiff filed a request with the Appeals Council on December 10, 2010 to review the ALJ's decision. (Doc. 10, pp. 9-10) The Appeals Council denied plaintiff's request on June 14, 2012, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-6)

Counsel brought this action on behalf of plaintiff on August 13, 2012 seeking judicial review of the Commissioner's decision. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on March 22, 2013 (Doc. 18), the Commissioner responded on July 19, 2013 (Doc. 24), and plaintiff replied on August 2, 2013 (Doc. 25). This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

The medical evidence in this case includes records from the Metro Nashville General Hospital (Metro General) Emergency Department (ED) covering the period March 10, 2007 through September 4, 2008. (Doc. 10, pp. 236-89) Plaintiff presented to the Metro General ED complaining of seizures on numerous occasions during this period. (Doc. 10, pp. 236-40, 245-89) Plaintiff's seizures were not witnessed (Doc. 10, pp. 237, 246-47, 251-52, 258, 266), and the diagnosis of

seizure was based on plaintiff's subjective description of events after the fact (Doc. 10, pp. 246, 251, 258, 264, 266, 276, 283-84). Plaintiff was described as a poor historian at least once. (Doc. 10, p. 276) Plaintiff reported on several occasions that he had not been taking his medications. (Doc. 10, pp. 237, 246, 256, 284) Plaintiff also admitted Marijuana use and screened positive for Cocaine during this period. (Doc. 10, pp. 242, 246, 251, 258, 264, 284) Although plaintiff consistently denied using alcohol, plaintiff's seizures were attributed at one point to "active chronic alcohol abuse," and his seizure symptoms attributed to "alcohol withdrawal." (Doc. 10, pp. 276, 278, 734) The ED records show that he was not admitted to the hospital subsequent to any of these visits.

On December 31, 2008, less than three weeks after the Appeals Counsel denied his request for review, plaintiff was taken by ambulance to the Metro General ED following a seizure. (Doc. 10, pp. 375-94) Plaintiff's seizure was witnessed/confirmed by an unnamed female family member, but plaintiff provided his seizure history to the Metro General ED staff. (Doc. 10, pp. 377, 380, 388) The record shows that plaintiff again had been "poorly compliant with [his] prescribed medication regimen," and that he had "just recently stopped [his] medication." (Doc. 10, p. 380) Although plaintiff denied current drug use, he screened positive for using crack Cocaine and barbiturates and was educated/advised that seizures are "often associated" with alcohol and drug abuse. (Doc. 10, pp. 380-81, 384-85) Plaintiff underwent a CT scan of the head during this visit. The CT scan revealed: mild generalized brain atrophy; no evidence of acute intracranial abnormality, chronic sinus disease or remote post traumatic sinus injury; and no evidence of acute fracture. (Doc. 10, pp. 390-391) Plaintiff was released from the Metro General ED the same day.

Plaintiff received treatment at Centerstone Community Mental Health Clinic (Centerstone) during the period September 16, 2008 through October 10, 2010. (Doc. 10, pp. 308-73, 414-51, 468-83) The Centerstone records include an unsigned Clinically Related Group (CRG) assessment

completed on September 16, 2008 that indicated plaintiff exhibited: marked limitations in activities of daily living; extreme limitations in interpersonal functioning; extreme limitations in concentration, task performance, and pace; and extreme limitations in adapting to change. (Doc. 10, pp. 309-10)  The CRG assigned plaintiff to Consumer Group 1: persons with severe and persistent mental illness.  (Doc. 10, p. 311)  Plaintiff was assessed at intake to have a current Global Assessment of Functioning (GAF)[1] score of 45, with a high score of 50, and low score of 42.  (Doc. 10, pp. 311, 361)  The intake assessment was based on plaintiff's subjective representations to Monica Gretter, LCSW (licensed clinical social worker).  (Doc. 10, pp. 364-72)  The Centerstone records show that Dr. Kamisha English, M.D., began to treat plaintiff on September 23, 2008.  (Doc. 10, p. 313)

Centerstone medical progress notes for the period October 2008 through July 2009 show that plaintiff's GAF scores assigned at intake were carried forward without further assessment during plaintiff's subsequent course of treatment  (Doc. 10, pp. 320, 345, 361, 415, 423, 429, 442) until, on July 7, 2010, a second unsigned CRG assessment was completed (Doc. 10, pp. 449-51).  The later CRG assessment indicated that plaintiff exhibited: marked limitations in activities of daily living; extreme limitations in interpersonal functioning; moderate limitations in concentration, task performance, and pace; and marked limitations in adapting to change.  (Doc. 10, pp. 449-50)  Plaintiff was again assigned to Consumer Group 1.  (Doc. 10, p. 451)  His GAF score this time was assessed as 42, with a high of 45 and low of 40 (Doc. 10, p. 451).  These revised GAF scores also were carried forward without amendment until October 20, 2010.  (Doc. 10, pp. 468-83)

---

[1]  The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas. *See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

Dr. Charles Colvin, M.D., performed a physical residual functional capacity (RFC) assessment on December 5, 2008 based on plaintiff's seizure disorder. (Doc. 10, pp. 299-304) Dr. Colvin determined that plaintiff's symptoms could reasonably be attributed to seizure disorder, but that "great weight" was assigned to negative neurologic exams and documented noncompliance with medications. (Doc. 10, p. 303) From these two factors, Dr. Colvin determined that plaintiff's claims were only partly credible. (Doc. 10, p. 303) Dr. Nathaniel Robinson, M.D., concurred in Dr. Colvin's report "as written" on February 3, 2009. (Doc. 10, p. 395)

Robert Paul, Ph.D., conducted a mental RFC assessment on March 5, 2009. (Doc. 10, pp. 396-413) Dr. Paul determined that plaintiff's limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation were for the most part not significant with only moderate limitations in the areas of his ability to understand and remember detailed instructions, ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and ability to set realistic goals or make plans independently. (Doc. 10, pp. 410-11)

Following the administrative hearing, Lisa Patterson, M.A., and Kathryn Sherrod, Ph.D., provided a psychological evaluation and medical source statement (mental) to the ALJ at the ALJ's request. (Doc. 10, pp. 454-62) The report was based on a clinical interview with plaintiff, as well as behavioral observations and test results. (Doc. 10, p. 457)

The medical source statement, signed by both Ms. Patterson and Dr. Sherrod, reflect that plaintiff's "ability to do work-related activities on a sustained basis" was not affected by his mental impairments. (Doc. 10, pp. 454-56) In the accompanying psychological evaluation, Ms. Patterson and Dr. Sherrod concurred in the diagnosis that plaintiff was "malingering" during the course of the evaluation, that he exhibited Cocaine dependence in early full remission, and that he had a current

GAF score of 61-65.  (Doc. 10, p. 461)

Ms. Patterson and Dr. Sherrod conducted a second assessment in October 2010, again at the ALJ's request, this time taking into account earlier Centerstone records provided to them by the ALJ.  (Doc. 10, pp. 463-67)  The second medical source statement (mental), again signed by both Ms. Patterson and Dr. Sherrod, was the same as the first.  (Doc. 10, pp. 465-67)  Apart from adding Cannabis abuse as a diagnosis, the diagnoses in the "addendum" were the same as in the first evaluation.  (Doc. 10, p. 464)

On March 18, 2011, more than four months after the ALJ entered his decision, plaintiff's attorney, Mr. Williamson, faxed the Appeals Council a copy of a medical source statement (mental) and psychological evaluation completed on March 16, 2011 by James Michael Scott, M.A., and David Terrell, Ph.D.  (Doc. 10, pp. 484-95)  The medical source statement reflected marked limitations in the following areas: ability to maintain attention for extended periods; ability to complete a normal work day and work-week without interruptions; and ability to get along with coworkers and peers.  (Doc. 10, pp. 493-94)  The accompanying psychological evaluation report listed the following diagnoses: severe bipolar I disorder without psychotic features; history of polysubstance abuse; history of intermittent explosive disorder; mild mental retardation; learning disorder with confirmed functional illiteracy in reading comprehension and spelling; personality disorder; history of skull/brain injury; an estimated GAF score of 46-48 during the previous year, and 46 at the time of testing.  (Doc. 10, p. 492)  Plaintiff's attorney submitted a revised medical source statement, confidential addendum, and revised psychological assessment prepared by Mr. Scott and Dr. Terrell in March, June, and August 2011 respectively to the Appeals Council on

August 26, 2011.[2]  (Doc. 10, pp. 1059-95)

## B.  Transcript of the Hearing

Plaintiff's non-attorney representative made the following opening statement at the hearing:

> Your honor, Mr. Brannon has mainly psychological, emotional problems.  He has been treated for these problems at the Centerstone Community Mental Health Center for some time now.  While he has had problems with drugs in the past, your honor, it is not a continuing significant part of his lifestyle, and it is not a material part of the case we don't feel.  And the psychologist or the people he has been working with at Centerstone have addressed some of his problems and functional limitations in their records and forms.

(Doc. 10, p. 14)

Upon initial questioning, the ALJ established that plaintiff was forty-nine years of age at the time of the hearing, that he attended the eleventh grade, that he did not receive a GED, that he could read and write, that he did not hold a driver's license, that he had no special job training, that he held no licenses, degrees, or certificates, that he lived with his mother, that he had not worked since September 2008, and that he had not worked because he "ha[d] seizures all the time . . . ," after which he would "get mad real easy."  (Doc. 10, p. 16)

---

[2]  As noted, the medical source statements and reports prepared by Mr. Scott and Dr. Terrell were not before the ALJ when he entered his unfavorable decision.  Neither was the following attorney-supplied evidence present in the administrative record: 1) plaintiff's high school transcripts and health records (Doc. 10, pp. 497-501); an undated copy of "Mental Evaluation Reporting Requirements" published by the Nashville Disability Determination Section of the SSA (Doc. 10, pp. 502-12); a copy of "Regional Memorandum No. 03-091" dated September 16, 2003 published by the SSA's Chicago Regional Office (Doc. 10, pp. 513-18); a synopsis compiled by counsel of the diagnoses of eight different mental health care organizations during the period April 2001 through August 2010 (Doc. 10, pp. 519-23); Tennessee Christian Medical Center records covering the period August 9 through 15, 2003 (Doc. 10, pp. 524-67); a Skyline Medical Center record for September 30, 2009 (Doc. 10, pp. 569-72); Vanderbilt University Medical Center records for the period  January 19, 2005 through February 7, 2007 (Doc. 10, pp. 577-622); United Neighborhood Health Services records for the period May through November 2010 (Doc. 10, pp. 721-730); Metro General medical records for the period May 2009 through November 2010, including a subsequent CT scan of plaintiff's head made on December 23, 2009 (essentially a "negative study")(Doc.  10, pp. 732-803); Buffalo Valley, Inc. drug and alcohol rehab records for the years 2000 and 2001 (Doc. 10, pp. 806-10); Tennessee Department of Mental Health and Developmental Disabilities records for the year 2001 (Doc. 10, pp. 811-30); Metro General medical records for the years 1988 through 1994 (Doc. 10, pp. 847-75); Tennessee Department of Correction medical records covering the years 1995 through 1998 (Doc. 10, pp. 832-46, 876-1058).

The ALJ asked plaintiff if depression or anxiety kept him from working, to which plaintiff responded, "[s]ometime I'm just about ready to give up life period." (Doc. 10, p. 16) When the ALJ asked about the medication prescribed by Centerstone, plaintiff testified that it helped "[a] little bit, but sometimes [he] still just g[ot] a little low . . . ." (Doc. 10, p. 16) Plaintiff testified that the only side effect of the medication was that it made him "sleepy." (Doc. 10, p. 17)

Plaintiff testified that he did not have a regular doctor, and that he received medication for seizures through the "United Neighborhood Clinic" on "South Eighth Street." (Doc. 10, p. 17) Plaintiff was unsure of the actual name of the clinic because he had been there only twice. (Doc. 10, p. 17)

Plaintiff testified that he took his seizure medication – Tylenol 100 and Dilantin – the way he was "supposed to," that he never ran out of his medications, but that he continued to have seizures anyway. (Doc. 10, p. 18) When asked whether the seizures were "big ones" or "little ones," plaintiff testified that he always lost consciousness, that he lost control of his bowels once, and that he hurt himself another time. (Doc. 10, pp. 18-19) According to plaintiff, he had "about two or three [seizures] in the last two months," that he always went to the Metro General when they occurred, that he did not see a neurologist for his seizures, and that his seizures began after he received a gunshot wound to the head in "'85 or '86." (Doc. 10, pp. 20-21)

Plaintiff testified that he had been arrested once, and that he had been "free" from alcohol and drugs for "seven [or] eight months." (Doc. 10, pp. 20-21) Plaintiff testified that the only household chore he performed was washing dishes, that he went to "NA" meetings, that he visited friends in their homes, that he went to church, but that he "stay[ed] in the house most of the time." (Doc. 10, p. 22)

Plaintiff testified as following in response to questions by his non-attorney representative:

he received his medications from Centerstone; Centerstone representatives had discussed his circumstances with him and had "tr[ied] to help [him] get a house"; he began going to "NA" meetings on his own; he "just tr[ied] to stay quiet" around other people; he had to lie down during the day because of his medication; he did not know why he lost his temper; he did not recall having a CT scan of his brain at Metro General the previous December; he never worked for his uncle remodeling houses as reflected in the Centerstone records. (Doc. 10, pp. 22-24)

The VE testified upon questioning by the ALJ that plaintiff's past relevant work was as a kitchen helper and stock clerk, the former medium-unskilled work and the latter heavy-semiskilled work. (Doc. 10, p. 24) Neither provided transferrable skills. (Doc. 10, pp. 24-25)

Prior to presenting hypotheticals to the VE, the ALJ asked if the VE was "testifying and w[ould] continue to testify throughout the hearing with the Dictionary of Occupational Titles, DOT, unless [he] indicate[d] otherwise . . . ." (Doc. 10, p. 25) The VE replied, "Yes, Sir." (Doc. 10, p. 25) The ALJ then posed the following hypothetical to the VE:

> Assume a person of the claimant's age, education, and work experience. Assume that such a person is able to work at any exertional level but no exposure to hazards such as heights, moving machinery, or driving. Assume also that the person's able to understand, remember, and carry out only short and simple instructions, and make judgments only on simple work-related decisions with occasional interaction with the public. Assume no production rate, pace, quota, assembly line jobs. Assume no jobs with changing work procedures or requirements but instead simple routine tasks. Would such a person be able to perform any of the past relevant work of the claimant?

(Doc. 10, p. 25) The VE answered that "the job of kitchen helper, an unskilled, entry-level job, would be available to a person with those limitations." (Doc. 10, p. 25) When asked "[w]hat other unskilled, medium and light would be available," the VE testified that "the stock clerk job would also be available . . . ." (Doc. 10, p. 26) The ALJ then instructed the VE to identify light work

available that the hypothetical person would be able to perform. (Doc. 10, p. 26) The VE testified that the person would be able to perform the following light-unskilled work: office helper, house sitter, and courier/messenger. (Doc. 10, p. 26)

The ALJ then asked the VE what the effect would be on the work described above if the hypothetical person had a 51-60 GAF Score. (Doc. 10, p. 27) The VE testified that, although there would be no work available for a person with a GAF Score of 50, all the jobs described above would be available to a person with a GAF Score of 51-60. (Doc. 10, pp. 27-28) Finally, the VE testified that, if plaintiff's testimony were "fully credible," the "events associated with having seizures disorder and some of the other experiences" plaintiff described "would make it very difficult for him to work on a full-time sustained basis." (Doc. 10, p. 28)

The ALJ offered plaintiff's non-attorney representative the opportunity to cross-examine the VE, but Mr. Friedlob declined. (Doc. 10, p. 28) Mr. Friedlob did, however, make the following closing argument:

> [W]e would like to note that the records from centerstone, in addition to having GAF scores below the 50 range . . . also indicate limitations of function with the marked, extreme, and moderate levels. And we would take note of the definition of 'moderate,' your honor, which is different than it's typically used in regular Social Security. It is more restrictive than typically the term 'moderate' is used. We would also like to note for the record that in Exhibit 13F there is a CT scan of the head, performed on December 31, 2008, that indicates mild generalized brain atrophy. And that's what the record [INAUDIBLE].

(Doc. 10, pp. 28-29)

## C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match

the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

A review of the record shows that the ALJ complied with the required five-step process. Plaintiff does not allege that he did not.

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole,

then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *see also Key*, 109 F.3d at 273.

## B.  Claims of Error

### 1.  Whether the ALJ's Decision Violated SSR-00-4P By Not Acknowledging and/or Resolving the VE's Allegedly Conflicting Testimony (Doc. 19, ¶ B, pp. 18-25)

Plaintiff argues generally in his first claim of error that the SSA failed to carry its burden of proof in determining that plaintiff could perform jobs that exist in significant numbers. (Doc. 19, ¶ A, p. 17)  More particularly, plaintiff argues that the VE's testimony was in "actual, obvious, indisputable conflict with information in the DOT" (emphasis in the original omitted), and that the ALJ neither acknowledged the conflict nor made a ruling to resolve it. (Doc. 19, ¶¶ B.1-2, p. 18)


The crux of plaintiff's argument is that the ALJ instructed the VE to identify jobs that did not require plaintiff to drive, but that "driving [wa]s an integral part of 2 of the 3 jobs [the VE] identified and [the] 3rd job . . . involve[d] at least some exposure to driving" (emphasis in the original omitted). (Doc. 19, ¶¶ B.1-2.a-i, pp. 18-24)  According to plaintiff, work as a courier/messenger and office helper required that he drive, and that work as a house sitter involved possible exposure to driving.  Plaintiff also argues that the DOT is outdated, and that the VE's occupational descriptions should have taken into consideration more current definitions.

Social Security Ruling 00-4P instructs the ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provide by VEs or VSs [vocational specialists] and information in the . . . [DOT] . . . ."  SSR 00-4P, 2000 WL 189704 at *1 (Dec. 4, 2000).  However, the law is well established in the Sixth Circuit that the ALJ's duty to this end is satisfied if he asks the VE whether his testimony is consistent with the DOT.  *Kyle v. Comm'r of*

*Soc. Sec.*, 609 F.3d 847, 858 (6th Cir. 2010); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601 (6th Cir.

2009). The ALJ is not required to conduct an independent investigation into the VE's testimony to

determine if the VE's testimony is correct. *Kyle*, 609 F.3d at 858; *Lindsley*, 560 F.3d at 606.

As shown at p. 9, the ALJ asked the VE whether his testimony was consistent with the DOT,

to which the VE answered, "Yes, Sir." In asking that question, and receiving the VE's answer in

the affirmative, the ALJ fulfilled his duty under *Kyle* and *Lindsley*. As there was nothing in the

subsequent exchanges between the ALJ and the VE, or apparent anywhere else in the transcript of

the hearing, that should have alerted the ALJ to an "actual, obvious, indisputable conflict," the ALJ

had no obligation to pursue the matter.

*Kyle* and *Lindsley* foreclose plaintiff's arguments under the facts present here. Therefore,

plaintiff's first claim of error is without merit.[3]

## 2. Whether the ALJ Violated the Treating Physician Rule
### (Doc. 19, ¶ C, pp. 25-27)

Plaintiff argues in his second claim of error that the ALJ violated the treating physician rule

by not giving controlling weight to Dr. English's September 23, 2008 opinion that plaintiff's GAF

Score was 45 at the time, that it was 50 at its highest, and that it was 42 at its lowest.[4] (Doc. 19, ¶

C, pp. 25-27) Plaintiff also argues that the ALJ did not provide a good reason for rejecting the GAF

scores noted by other Centerstone employees. (Doc. 19, ¶ C, pp. 26-27) Finally, plaintiff argues

---

[3] The Magistrate Judge notes for the record that the DOT job descriptions on which the VE relied did, in fact, refer to driving in the courier/messenger and office helper position descriptions, and that exposure to driving could be inferred as a possibility in the house sitter position. However, none of these positions actually require driving. Driving is merely one of many duties that might be included in a particular job description. Plaintiff's argument that driving was, in fact, required is strained and not supported by a plain reading of the job descriptions at issue.

[4] Dr. English's name appears repeatedly in the record during the period September 23, 2008 through October 8, 2009. (Doc. 10, pp. 313-14, 317, 321, 323, 336, 338-41, 345-47, 352, 356, 358, 361-62, 420-21, 423-27, 430-31, 435, 440, 443-44, 472, 478, 521) Although it cannot be determined from the Centerstone records whether Dr. English actually was a "treating physician" within the meaning of that expression in the Social Security context, the Magistrate Judge assumes without deciding that she was a "treating physician" for the purpose of this analysis.

that the ALJ was "under an affirmative duty at the time he issued his decision to recontact Centerstone's treatment providers to obtain additional information about the GAF scores . . . ." (Doc. 19, ¶ C, p. 27)

"The Commissioner has elected to impose certain standards on the treatment of medical source evidence." *Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 375 (6ᵗʰ Cir. 2013) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6ᵗʰ Cir. 2011)(quoting 20 C.F.R. § 404.1527(d)(2)). These standards, set forth in administrative regulations, describe the various types of evidence that the Commissioner will consider, 20 C.F.R. § 404.1512, who can provide evidence to establish an impairment, 20 C.F.R. § 404.1513, and how that evidence will be evaluated, 20 C.F.R. § 404.1520b. *Gayheart*, 710 F.3d at 375. Such evidence may contain medical opinions, which "are statements from physicians and psychologists ... that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis," physical and mental restrictions, and what the claimant can still do despite his impairments. *Gayheart*, 710 F.3d at 375 (quoting 20 C.F.R. § 404.1527(a)(2)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c). *Gayheart*, 710 F.3d at 375.

As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R §§ 404.1502 and 404.1527(c)(2)). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Gayheart*, 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p,

1996 WL 374180, at *2).

The source of the opinion, therefore, dictates the process by which the Commissioner accords it weight. Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.-1527(c)(2)). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544). Failure to comply with the treating physician rule is subject to subject to harmless error analysis. *Gentry v. Comm's of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014)(citing *Wilson*, 378 F.3d at 545-46).

Although the ALJ does not address Dr. English in the context of a "treating physician," he does note that she conducted "an evaluation" of plaintiff "one week following intake" at

Centerstone.  (Doc. 10, p. 74)  The ALJ goes on to note that "[t]he claimant, through his representative, has repeated calls to have substantial, if not controlling weight, placed in favor of the TCRG/GAF assessments provided through Centerstone, for the proposition that he is unable to mentally sustain work."  (Doc. 10, p. 76)(internal reference omitted) The ALJ went on to write:

> The undersigned respectfully declines the invitation to do so.  Even supposing, for the sake of argument, had the TCRG assessments qualified as medical source statements within the meaning of Social Security Ruling 96-2P – and this is highly debatable, seeing that the assessments were unsigned and it is impossible to determine with certainty the name or professional title of the person who completed them . . . . this does not change in any way the concerns outlined above that in turn call the question of accuracy and utility of the assessments.  In all these things, it must be remembered that under Social Security Ruling 96-2p, controlling weight may not be given to a treating source's medical opinion unless it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and which further directs that the undersigned cannot decide a case in reliance on a medical opinion without some reasonable basis for that opinion.  To put it simply, the reasonable basis simply does not exist in this instance.

(Doc. 10, p. 76)(internal references omitted)

The record shows that Dr. English treated plaintiff during the period September 23, 2008 through October 8, 2009.  Therefore, she was a treating physician under the rules, and her opinion should have been given controlling weight unless the ALJ provided a good reason for not doing so.  The question is whether Dr. English's opinion as to plaintiff's GAF scores was entitled to controlling weight under the treating physician rule.

The ALJ's reason for not giving controlling weight to the GAF scores, *i.e.*, to the scores reflected in the records in which Dr. English's name appears, was a good reason, and one supported by substantial evidence.  First, the record shows that Dr. English did not determine the GAF scores at issue.  As previously noted at p. 4, the September 16, 2008 clinical intake assessment, including

the determination of those scores, was completed by Monica Gretter, LCSW. The record shows that Dr. English's first contact with plaintiff did not occur until seven days later on September 23, 2008. (Doc. 10, pp. 313, 321, 338, 345, 352, 356, 361-62) Second, as previously noted at p. 4, there is substantial evidence that the GAF scores at issue were based on plaintiff's subjective representations to M. Gretter, and not on any objective medical evidence. Finally, the record is devoid of any evidence attributable to Dr. English that she made an independent determination of the GAF scores at issue. On the contrary, the record supports the conclusion that Dr. English simply took the GAF scores assigned at intake by Ms. Gretter, and carried those scores forward without making any effort to validate them. In short, the scores at issue were Ms. Gretter's . . . not Dr. English's. For these reasons, Dr. English's "opinion" as to plaintiff's GAF scores was not entitled to controlling weight.

Even if it were determined on subsequent review that the ALJ committed a technical error in not specifically noting that Dr. English was a treating physician under the rules, that error is harmless. A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009)(internal quotation marks and citation omitted). A GAF score is not dispositive in and of itself, rather it is significant only to the extent that it elucidates an individual's underlying mental issues. *Id*. at 284; *see also* 65 Fed.Reg. §§ 50746, 50764–65 (2000)("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings."). Although a GAF score "may be of considerable help to the ALJ in formulating the RFC . . . it is not essential to the RFC's accuracy." *Howard v. Commissioner of Social Sec*. 276 F.3d 235, 241 (6th Cir. 2002)(the ALJ's failure to refer to GAF score did not make his RFC analysis unreliable)). In other words, a GAF score is not "raw medical data" and, as such, GAF scores cannot establish mental functioning unsupported by substantial evidence." *See Kennedy*, 247 Fed.Appx. at 766; *see also*

*DeBord v. Commissioner of Social Security*, 211 Fed.Appx. 411 (6ᵗʰ Cir. 2006). Indeed, the ALJ is "not required to consider . . . GAF scores." *Keeler v. Comm'r of Soc. Sec.*, 511 Fed.Appx. 472, 474 (6ᵗʰ Cir. 2013)(citing *Howard*, 276 F.3d at 241). Because the ALJ was not required to consider GAF scores, any failure on the ALJ's part for not explaining his decision to discount those scores in the context of the treating physician rule is harmless.

That the ALJ was not required to consider plaintiff's GAF scores also goes to plaintiff's final argument on this point, *i.e.*, that the ALJ was "under an affirmative duty at the time he issued his decision to recontact Centerstone's treatment providers to obtain additional information about the GAF scores . . . ." Given that the ALJ is not required to consider GAF scores in the first place, the ALJ was not under an affirmative duty to obtain additional information from Centerstone about plaintiff's GAF scores. Consequently, there is no error.

For the reasons explained above, plaintiff's second claim of error is without merit as to all arguments raised.

### 3. Whether the ALJ Failed to Follow Applicable Statues and Regulations Pertaining to Cases Involving Drug Addiction and/or Alcoholism (Doc. 19, ¶ D, pp. 27-28)

Plaintiff argues that, although the ALJ determined that "'Polysubstance Abuse, in partial remission' was a severe impairment," he did not determine plaintiff's "disability claim in the context of all of his impairments, including DAA, but . . . only considered the impact of the other impairments." (Doc. 19, ¶ D, pp. 27-28) In short, plaintiff argues that the ALJ failed to follow the procedures set forth in 20 C.F.R §§ 404.1535(a) and 416.935(a). Plaintiff relies on *Williams v. Barnhart*, 338 F.Supp.2d 849 (M.D. Tenn. 2004) for the proposition stated in that case that "[t]he ALJ must reach this determination . . . using the five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders."

*Williams*, 338 F.Supp.2d at 863 (citing *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001)).

"An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Gayheart*, 710 F.3d at 380 (quoting 42 U.S.C. § 423(d)(2)(C)). The regulation explains that "[t]he key factor" in determining whether drug or alcohol abuse is material in a given case is whether the claimant would still be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). "Substance abuse is not considered until the Commissioner first makes a finding that a claimant is disabled." *Gayheart*, 710 F.3d at 381 (citing 20 C.F.R. § 404.1535(a)). The ALJ is then required to "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 CFR § 416.935(b)(2).

The record shows that the ALJ considered plaintiff's history of drug and alcohol abuse together with his other severe impairments in determining at step three that plaintiff's severe impairments did not meet or equal one of the listed impairments. (Doc. 10, ¶ 4, pp. 65-68) The record shows that the ALJ considered plaintiff's history of drug and alcohol abuse at length together with his other severe impairments in his RFC assessment. (Doc. 10, ¶ 5, pp. 68-81) In short, the record does not support plaintiff's claim that the ALJ did not determine his "disability claim in the context of all of his impairments, including DAA, but . . . only considered the impact other impairments."

As for the ALJ's final disability determination, as shown above, the ALJ was required under the regulations to consider the effects of drug and alcohol abuse further <u>only</u> if the ALJ determined at step five that plaintiff was disabled. Having determined that plaintiff was not disabled based on

the combined effects of all plaintiff's severe impairments, including his history of drug and alcohol abuse, the ALJ was not required to consider the matter of drug and alcohol abuse further.

The ALJ complied with *Williams*, *Gayheart*, and SSA regulations as they pertain to disability claims where drug and/or alcohol abuse are factors. Therefore, plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Failed to Develop the Record Fully (Doc. 19, ¶ E, p. 28)

Plaintiff asserts that the ALJ failed to develop the record. More particularly, plaintiff claims that, although he was represented at the hearing, his representative, Mr. Friedlob:

> . . . was not up to the task of obtaining and submitting all relevant evidence, as established by his failure to even obtain Mr. Brannon's school records, his failure to conduct a meaningful examination of Mr. Brannon at the hearing and his failure to ask a single question of a VE who obviously did not know what he was talking about.

(Doc. 19, ¶ E, p. 28)

The ALJ has a duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 111 (2000)(citing *Richardson*, 402 U.S. at 400-01). The ALJ has a special duty to develop the record when the claimant is proceeding without representation. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). However, no such special duty applies where the claimant is represented by counsel at the administrative hearing. *Bass v. McMahon*, 499 F.3d 506, 514 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). That special duty also does not extend in those circumstances where, as here, the claimant is represented by a non-attorney representative. *Kidd v. Comm'r of Soc. Sec.*, 283 Fed.Appx. 336, 337 (6th Cir. 2008); *see also*, 42 U.S.C. § 406(a); 20 C.F.R. § 404.1705(b)(both standing for the proposition that federal regulations permit claimants to choose non-attorneys to

represent them at the administrative level).

The ALJ conducted a hearing in plaintiff's case, questioned plaintiff under oath, solicited the testimony of the VE, reviewed the decision of the ALJ in an earlier administrative proceeding, and scrupulously reviewed over two hundred fifty pages of medical records. The ALJ held the record open for 60 days following the hearing to provide plaintiff time to "submit whatever else you see fit" (Doc. 10, p. 29) and, as previously noted at pp. 5-6, he ordered not one but two consultive assessments by Ms. Patterson and Dr. Sherrod. For his part, the non-attorney representative made an opening statement (Doc. 10, p. 14), examined claimant during the hearing (Doc. 10, pp. 22-24) and, although he did not question the VE, he did make an effective closing argument (Doc. 10, pp. 28-29).

As shown above, the ALJ did not fail in his responsibilities to develop the record in this case. Therefore, plaintiff's fourth claim is without merit.

### 5. Whether the ALJ's RFC Determination Was Supported by Substantial Evidence (Doc. 19, ¶ F, pp. 28-29)

Plaintiff's final claim of error is quoted below in its entirety:

> If Mr. Brannon's polysubstance abuse was a[s] bad as the ALJ depicts it to be, then his finding regarding **his RFC is clearly not supported by substantial evidence**. Had the ALJ included in his RFC finding the functional limitations resulting from polysubstance abuse (the condition the ALJ found to be responsible for the low GAF scores), **the RFC finding would have been very substantially more restrictive**.

(Doc. 19, ¶ F. pp. 28-29)(emphasis added)

First, as previously discussed at p. 20, the record does not support plaintiff's assertion that the ALJ did not consider plaintiff's history of drug an alcohol abuse in his RFC determination. Second, lacking any supporting factual allegations, plaintiff's two-part claim – highlighted above

– is conclusory. The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Finally, to the extent that plaintiff's final claim of error seeks to establish error in the context of plaintiff's low GAF scores, as previously established at pp. 18-19, the ALJ was not required to consider GAF scores in his decision.

Plaintiff's fifth claim of error is without merit.

### 6. Whether Good Cause Exists to Remand this Case for Consideration of the Evidence Submitted to the Appeals Council but Not Considered by the ALJ (Doc. 19, ¶ G, p. 29)

Plaintiff's final argument is not a claim of error. Rather, it is a demand that his case be remanded to consider evidence that was submitted to the Review Council, but was not before the ALJ at the time the ALJ entered his decision. Plaintiff's argument is quoted below in its entirety:

> Mr. Brannon's disability claim has not been considered in light of a fully-developed record. Given his mental retardation, decades long struggles with mental illness and substance abuse and his seizure disorder, he is not to blame for the incomplete record upon which the ALJ made his final decision. Accordingly, good cause should be found for remanding this case pursuant to Sentence 6 for consideration of the evidence submitted to the A.C.

(Doe. 19, p. 29) Although plaintiff makes no effort to develop the argument above in his motion for judgment on the administrative record, he does develop the issue somewhat in his reply, but only in the context of plaintiff's high school records and 1995 psychological test results which, according to plaintiff establish that he is "mildly mentally retarded."[5] (Doc., 25, ¶ IV.1-2, pp. 10-11)

---

[5] Although plaintiff does not say so specifically, the other records at issue comprise the 600-plus pages of records addressed at pp. 6-7 and n. 2, including the 2011 medical source statements and psychological evaluations provided by Mr. Scott and Dr. Terrell. However, plaintiff argues for remand only in the context of his high school records and the results of a 1995 psychological test. Because plaintiff has not developed his argument based on any of

23

The sixth sentence under § 405(g) reads in relevant part as follows:

> The court may . . . remand the case to the Commissioner of Social
> Security for further action by the Commissioner of Social Security,
> and it may at any time order additional evidence to be taken before
> the Commissioner of Social Security, but only upon a showing that
> there is **new** evidence which is **material** and that there is **good cause**
> for the failure to incorporate such evidence into the record in a prior
> proceeding . . . .

(emphasis added)   Under § 405(g), plaintiff bears the burden of establishing that remand is
warranted.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Remand under sentence six of § 405(g) is appropriate "only if the evidence is 'new' and
'material' and 'good cause' is shown for the failure to present the evidence to the ALJ."  *See Bass*,
499 F.3d at 513; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  Evidence is
"new" if it did not exist at the time of the administrative proceeding, and "material" if there is a
reasonable probability that a different result would have been reached if introduced at the
proceeding.  *Ferguson*, 828 F.3d at 276.  "Good cause" is demonstrated by "a reasonable
justification for the failure to acquire and present the evidence for inclusion in the hearing before
the ALJ."  *Foster*, 269 F.3d at 357.  The law is well established that the Sixth Circuit takes "a harder
line on the good cause test" with respect to timing and thus requires that the claimant "give a valid
reason for his failure to obtain evidence prior to the hearing."  *Courter v. Comm'r of Soc. Sec.*, 479
Fed.Appx. 713, 725 (6th Cir. 2012)(quoting *Oliver v. Sec'y of Health & Hum. Servs.*, 804 F.2d 964,
966 (6th Cir. 1986)).

Assuming for the sake of argument that plaintiff's high school records – dating back to the

---

this other evidence, including the opinions of Mr. Scott and Dr. Terrell (mentioned only in the statement of facts and
medical history in his memorandum), any argument for remand based on this other evidence is waived.  *See Spirko v.
Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004)(citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)("[I]ssues
. . . unaccompanied by some effort at developed argumentation, are deemed waived."); *see also Curler v. Comm'r of Soc.
Sec.*, __ Fed.Appx. __ , 2014 WL 1282521* 10 (6th Cir.)(failing to "develop[] . . . argument to support remand . . . the
request is waived.")

early 1970s – and the psychological test results – dating back to 1995 – are somehow "material," they obviously are not "new." Indeed, plaintiff himself characterizes this evidence as "[r]eadily available," *i.e.*, that it existed at the time of the administrative proceeding. (Doc. 25, p. 10) Given this characterization, plaintiff cannot establish "good cause" for failure to produce it during the administrative proceedings below, nor does he make any effort to do so. Plaintiff's naked allegation in his fourth claim of error that his non-attorney representative, Mr. Friedlob, was "not up to the task" of representing him falls well short of showing that there was reasonable justification for failing to acquire and present this evidence for inclusion at the hearing.

Plaintiff has failed to carry his burden of persuasion that his case should be remanded under sentence 6 of § 405(g). Therefore, his argument to that end is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 18) be **DENIED,** and the Commissioner's decision **AFFIRMED.**

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 24th day of April, 2014.

/s/Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge
